UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MICHAEL DEROSA,** *et al.***,**

          **Plaintiffs,**

-v-                                       **Case No.:  2:13-cv-0472**
                                                **JUDGE SMITH**
                                              **Magistrate Judge Deavers**

**HESS OHIO RESOURCES LLC,** *et al.***,**

          **Defendants.**

## OPINION AND ORDER

This matter is before the Court on the parties' cross-motions for summary judgment. (Docs. 21 and 29).  The motions are fully briefed and ripe for review.  For the reasons that follow, the Court **GRANTS in part and DENIES in part** Defendants' motion and **GRANTS in part and DENIES in part** Plaintiffs' motion.

## I.      BACKGROUND[1]

Plaintiffs Michael DeRosa, Gregory and Melanie Eaton, and Mel-Tina, Ltd. collectively own 676 contiguous acres of real property in Richland and Wheeling Townships of Belmont County, Ohio.  On March 8, 2006, the Plaintiffs signed three identical oil and gas leases with Solid Rock Energy (hereinafter collectively referred to as the "Leases").  Plaintiff Michael DeRosa leased 49.57 acres, Plaintiffs Gregory and Melanie Eaton leased 53.75 acres, and Plaintiff Mel-Tina, Ltd., a limited liability company owned by Plaintiffs Michael DeRosa and

---

[1] The companion case, *Curtis, et al. v. Hess Ohio Resources, LLC, et al.*, Case No. 2:13-cv-0453, is factually similar to the case at bar.  The motions pending in that case will be addressed in a separate opinion.

Melanie Eaton, leased 511.67 acres.  (DeRosa Depo. at 6-12).  The Leases were recorded with the Belmont County Recorders Office at Volume 47, Pages 877-882.  (*See* Exhs. 2-4 of Phillips Depo.).  The Leases were later assigned to Marquette Exploration who, in turn, assigned the Leases to Hess Ohio Resources, LLC.

The Leases specifically provide that they "shall remain in force for a primary term of FIVE years from this date and as long thereafter as oil or gas or either of them is produced from said land, or from lands with which said land is pooled therewith by lessee."  (Leases ¶ 2).

Marquette applied for a drilling permit on September 29, 2010, representing that the well would be a "stratigraphic test well" and for "Production/Extraction."  (Ex. 7 to Pls.' MSJ).  The Ohio Department of Natural Resources ("ODNR") issued the permit on October 27, 2010.  The well was identified as the Porterfield Gas Unit A 1H-17 well (API # 34013206200000).  (Ex. 8 to Pls.' MSJ).  The well was permitted as a horizontal oil and gas well, to be drilled into the Marcellus formation at a depth of 5,400 feet.  In addition, when Marquette submitted its permit request, it also requested permission to begin "light construction work" prior to permit issuance, including "leveling the location and constructing the access road into said location."  (*See* Ex. D attached to Defs.' Mot.).

Prior to the issuance of the drilling permit, ODNR inspector Pat Shreve "granted permission to begin light construction prior to permit issuance."  (*See* Ex. C attached to Defs.' Mot.).  Marquette then prepared the well pad and began drilling operations for the well on or around December 3, 2010.  According to the "casing ticket" on file with ODNR, the spud date[2] was December 3, 2010.  (Ex. F attached to Defs.' Mot.).  The "Ohio Well Completions Report"

_____

[2] The term "spud date" is the date that the well bit is actually put into the ground.

provided by ODNR indicates that the project commenced on the same date.  (Ex. G attached to Defs.' Mot.).  Finally, a well completion record submitted by Marquette to ODNR indicates that drilling commenced on December 3, 2010, and was completed on April 11, 2011.  (Ex. E attached to Defs.' Mot.).  However, Plaintiffs contend that the actual spud date of the well was not until April 2, 2011.  (*See* Ex. 9 of Phillips Depo.).[3]  Even after the drilling was completed, however, the well still needed to be fractured.  The fracturing of the well did not start until June 8, 2011.  Halliburton proposed to do a "15-stage fracture" of the horizontal well.  However, Halliburton only fractured seven stages and stopped.  (Phillips Depo. Exs. 10-11).

At this point, Hess contends that the well was capable of production.  Hess has submitted a memorandum that stated, upon completion of the well, "gas came to the surface."  (Ex. H to Defs.' Mot.).  However, there was no infrastructure in the vicinity of the well to allow production.  Specifically, the production of gas requires a pipeline for any well to be operational, and there was no access to a pipeline.  Due to the lack of a pipeline, the well was "shut-in" pursuant to Paragraph 3 of the Leases.

On December 2, 2010, Marquette (the lessee at the time) filed a pooling declaration[4] with the Belmont County Recorder, forming a 640-acre drilling unit named the "Porterfield Gas Unit A."  (*See* Exhibit 5 to Phillips Depo.).  The pooling declaration allowed the pooling of the leases for the exploration of gas from the base of the Oriskany Sandstone formation and above.  The

---

[3] Ms. Phillips testified that Exhibit 9, a document from Stratagraph, Inc., does represent that the "spud date" was April 2, 2011.  (Phillips Depo. at 30-32).  However, she clarifies that she does not have personal knowledge of the spud date because Hess did not own the well then.  She stated that she would prefer to look at the report on file with ODNR.  (*Id.*).

[4] The Leases allowed for pooling, or combining of land covered by the Leases for the purpose of developing the land.  The pooling units were not to exceed 640 acres.  (Leases ¶ 6).

Porterfield Unit A contains approximately 23 acres subject to the DeRosa Lease, approximately 29 acres subject to the Eaton Lease, and approximately 253 acres subject to the Mel-Tina Lease. (*Id.*).[5] The subject well is not located on Plaintiffs' property, but is located within the pooled unit.

> The "shut in" provision of the lease specifically states:
>
> 3. ... If a well capable of producing gas from the above-described land is shut in and no gas therefrom is sold or used, such shut-in well shall, under all of the provisions of this lease, be considered a well on such land producing gas in paying quantities and shall continue this lease in force at all times while such well is so shut-in, whether during or after the primary term. If there be one or more of such shut-in gas wells and if there is no current production or operation on said land, lessee shall pay or tender as royalty $Five per year per net royalty acre retained hereunder, such payment or tender to be made on or before the anniversary date of this lease next ensuing or within ninety (90) days after such date and thereafter on or before the anniversary date of this lease during the period such well is shut in, to the royalty owners or to the royalty owners' designee.

(Leases ¶3). Thereafter, Marquette sent a "shut in" royalty check to Michael DeRosa in August of 2011, based on a "shut in" date of June 16, 2011.[6] Plaintiffs assert that they have not cashed these shut-in royalty checks based on their position that the Leases terminated at the end of the primary term.

The primary term of the Leases was scheduled to expire on March 8, 2011. However, Defendant Hess contends that certain provisions of the lease entitle them to hold the lease indefinitely. The relevant provisions include:

---

[5] The pooling unit is further comprised of land from leases with Kirke and Judi Porterfield, Brian Porterfield, Belmont-Jefferson Beagle Club, Inc., Diana and Ed Bartels, Harrison Leasing Company, Margaret Ann Williams, The DaGrava Family Revocable Living Trust, Bonnie Haskakis, David and Barbara Lucas, Jeffrey and Amy Miller, Mark Watkins, and Mark Derosa.

[6] Plaintiff Eaton also testified that he and his wife, as well as Mel-Tina, have received checks from Marquette and/or Hess in recent years that they have not cashed. (Eaton Depo. at 10-11).

-4-

6.  Lessee is authorized to pool or combine the land covered by this lease, or any portion thereof, or formations thereunder, as to oil and/or gas, with any other land, lease or leases when in lessee's judgement it is advisable to do so in order to properly develop or operate said premises, such pooling to be into a well unit or units not exceeding 80 acres for oil and 640 acres for gas.  Lessee shall execute and record an instrument or instruments identifying and describing the pooled acreage.  Production, drilling or reworking operations anywhere on a unit which includes all or part of this lease shall be treated if it were production, drilling or reworking operations under this lease, in lieu of the royalties elsewhere herein specified, lessor shall receive from a unit so formed only such portion of the royalty stipulated herein as the amount of lessor's acreage placed in the unit or lessor's royalty interest therein bears to the total acreage so pooled in the particular unit.

7.  If prior to discovery of oil or gas on said land lessee should drill a dry hole or holes, thereon, or if after discovery of oil or gas the production thereof should cease from any cause, this lease shall not terminate if lessee commences additional drilling or reworking operations within sixty (60) days thereafter or (if it be within the primary term) commences or resumes the payment or tender of rentals on or before the rental paying date next ensuing after the expiration of ninety (90) days from the date of completion of dry hole or cessation of production.  If during the last year of the primary term and prior to the discovery of oil or gas on said land lessee should drill a dry hole thereon, no rental payment or operations are necessary in order to keep the lease in full force during the remainder of the primary term.  If at the expiration of the primary term of this lease, oil or gas is not being produced on or from said land but lessee is then engaged in drilling or reworking operation, thereon, then this lease shall continue in force so long thereafter as drilling or reworking operations are being continuously prosecuted on said land; and drilling or re-working operation shall be considered to be continuously prosecuted if not more than sixty (60) days shall elapse between the completion or abandonment of one well and the beginning of operations for the drilling or reworking of another well.  If oil or gas shall be discovered and produced from any such well or wells drilled, being drilled or reworked, at or after the expiration of the primary term of this lease, this lease shall continue in force so long thereafter as oil or gas is produced from the leased premises.

(Leases ¶¶ 6-7).

Marquette did not produce any oil or gas from the drilled well.  Marquette then sold its operations to Hess on September 19, 2011, which included the Porterfield A and B wells.  Hess has not made any further attempts to extract oil or gas from the Porterfield A well.  However,

Hess claims that the Porterfield A well was capable of producing gas on June 16, 2011, when the shut-in was declared.  (Phillips Depo. at 38).

On January 12, 2012, Brent Riggle, a land agent representing Hess, sent an e-mail to Hess headquarters, which stated: "I forwarded your office e-mail address to Mike Derosa.  His attorney is going to send you something that explains how dissatisfied they are with our lease. . . .  I'm sure his letter will explain how he thinks the lease has expired since the well has yet to produce."  (Phillips Depo. at 60, referencing Ex. 14).

By April 2012, the Porterfield Unit A well still had not produced gas.  Hess produced an internal memo that referenced its efforts to do something with the well.  (Phillips Depo. at 60, referencing Ex. 16).  The memo states that "Both wells [the Unit A and B wells] were horizontally drilled into the Marcellus shale and completed only halfway with seven frac stages each."  It continued, ". . . Both were unloaded but stopped production as gas came to the surface, as a result there is no credible measure of the richness of the gas and the well productivity." (*Id*.).

There was an estimate from May 2012, that detailed the costs to have the Porterfield Unit A well worked over.  But email correspondence dated October 30, 2012 revealed that no "re-working" operations had yet occurred.  The "re-working" operations began in November 2012.  Hess's contractors began "rigging up" on November 5, 2012.  These "re-working" operations occurred within the original well bore of the Marcellus Shale.  The original well was not made any deeper.  (Phillips Depo. at 66-71).  After these reworking operations, December 5, 2012 e-mail correspondence at Hess reports that the Porterfield Unit A had "come around."  (*Id*. at 83-84, referencing Ex. 24).

Defendant Hess contends that as more oil and gas wells are drilled in Belmont County, the infrastructure will be built such that a commercially viable pipeline connection to the well will become available. But the capital expenditure for Hess to connect its two wells to an existing pipeline at this time is just too costly and the subject well remains shut-in.

## II. STANDARD OF REVIEW

The standard governing summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.,* 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must view all the facts, evidence and any inferences that may permissibly be drawn from the facts, in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587. The Court will ultimately determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-53. Moreover,

the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir. 1978). The Court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Liberty Lobby*, 477 U.S. at 249; *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

In responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Liberty Lobby*, 477 U.S. at 257). The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Liberty Lobby*, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The Court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. *Liberty Lobby*, 477 U.S. at 251-52; *see also Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street*, 886 F.2d at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*,

260 F.3d 654, 665 (6th Cir. 2001).

**III.    DISCUSSION**

Plaintiffs, Michael DeRosa, Greg and Melanie Eaton, and Mel-Tina, Ltd., have moved for summary judgment to declare that the subject oil and gas leases have expired at the conclusion of the primary term, five years.  Defendants, Hess and its predecessor Marquette, however, assert that they properly drilled the well, and by operation of the terms of the Leases, continue to hold the Porterfield Unit A Well shut-in while awaiting necessary infrastructure so the well can fully produce.

Plaintiffs set forth a number of reasons in support of their argument that the Leases have terminated.  The Court will address each of Plaintiffs' arguments in turn.

**A.    Did the Leases expire by their own terms?**

Plaintiffs assert that the Leases terminated at the end of the five-year primary term, on March 8, 2011.  However, Defendants assert that certain provisions of the Leases provide for extension of the lease agreements.

Oil and gas leases are contracts subject to the well-settled rules of contract construction and interpretation.  *See, e.g. Burtner-Morgan-Stephens Co. v. Wilson*, 63 Ohio St. 3d 257, 586 N.E.2d 1062 (Ohio 1992); *Phillips Exploration, Inc. v. Reitz*, No. 2:11-cv-920, 2012 U.S. Dist. LEXIS 178644 (S.D. Ohio Dec. 18, 2012) (Frost, J.).  Under Ohio law, interpretation of a written contract is a matter of law for initial determination by the Court.  *Construction Interior Sys., Inc. v. Marriott Family Rests., Inc.*, 984 F.2d 749, 754 (6th Cir. 1993) (applying Ohio law); *see also Long Beach Ass'n, Inc. v. Jones*, 82 Ohio St. 3d 574, 697 N.E.2d 208, 209 (Ohio 1998).  Moreover, contract interpretation is turned over to the fact-finder when the relevant contract

language is ambiguous.  *Potti v. Duramed Pharms., Inc.*, 938 F.2d 641, 647 (6th Cir. 1991) (applying Ohio law) (citing *Bahamas Agric. Indus., Ltd. v. Riley Stoker Corp.*, 526 F.2d 1174, 1179 (6th Cir. 1975)).  The Court decides whether a contract is ambiguous as a matter of law. *Id.* (citing *D.L. Baker & Co. v. Acosta*, 720 F. Supp. 615, 618 (N.D. Ohio 1989)).

Here, there is no dispute that the habendum clause of the Leases provides for a primary term of five years, commencing on March 8, 2006.  However, it is common in oil and gas leases to have leasehold saving provisions, such as a drilling operations clause.  (*See* Bruce M. Kamer, *Keeping Leases Alive in the Era of Horizontal Drilling and Hydraulic Fracturing: Are the Old Workhorses (Shut-in, Continuous Operations, and Pooling Provisions) Up to the Task?* 49 Washburn L.J. 283, 307 (2010)).  It is by the terms of the drilling operations clause and the shut-in provision that Defendants maintain that they still hold valid Leases on Plaintiffs' property.

The issue before the Court is whether these leasehold saving provisions are sufficient to maintain the Leases in this case.  Or, in other words, did the Leases terminate after the expiration of the primary term?  The parties' arguments focus on the drilling operations clause.  Defendants assert that as long as drilling operations commenced before the expiration of the initial five-year primary term, then the lease may be extended.  Combined with the shut-in provision, Defendant Hess asserts it has the right to hold the lease as long as it is capable of producing oil and gas.

First, the Court must look to the plain language of the lease agreement.  The drilling operations clause relied on by Defendants specifically states:

> 7. . . .  If at the expiration of the primary term of this lease, oil or gas is not being produced on or from said land but lessee is then engaged in drilling or reworking operation, thereon, then this lease shall continue in force so long thereafter as **drilling or reworking operations** are being continuously prosecuted on said land; and drilling or re-working operation shall be considered to be continuously prosecuted if not more than sixty (60) days shall elapse between the completion

or abandonment of one well and the beginning of operations for the drilling or
reworking of another well.  If oil or gas shall be discovered and produced from
any such well or wells drilled, being drilled or reworked, at or after the expiration
of the primary term of this lease, this lease shall continue in force so long
thereafter as oil or gas is produced from the leased premises.

(Leases ¶¶ 6-7) (emphasis added).

Ohio courts have not directly interpreted the phrase "engaged in drilling or reworking

operations."  There are federal circuit courts, district courts and state courts that have defined

"engaged in drilling or reworking operations" and have found the term to be unambiguous.  *See*

*Anderson v. Hess Corp.*, 649 F.3d 891, 897-899 (8th Cir. 2011) (concluding that the term

"'engaged in drilling or reworking operations' is not ambiguous and means 'engaged in drilling

operations or reworking operations'" and affirming the district court's findings that Hess was

engaged in drilling operations at the end of the primary term by virtue of its preparatory work);

*Wold v. Zavanna, LLC*, No. 4:12-cv-43, 2013 U.S. Dist. LEXIS 181631 (D. N.D. Dec. 31, 2013)

(finding defendant's drilling operations sufficient to extend the lease beyond the primary term,

which included obtaining the necessary permits and regulatory approvals for drilling and

engaging in other development activity).

Commentators on this issue have opined that:

The general rule is that actual drilling is unnecessary, but the location of well
sites, hauling lumber on the premises, erection of derricks, providing a water
supply, moving machinery on the premises and similar acts preliminary to the
beginning of the process of drilling, when performed with the bona fide intention
to proceed with diligence toward the completion of the well, constitute a
commencement or beginning of a well or drilling operations within the meaning
of the lease.

2 W.L. Summers *Oil and Gas* § 15:19 (3d ed. 2008).  Another opinion includes:

In brief, drilling operations may be described as any work or actual operations
undertaken or commenced in good faith for the purpose of carrying out any of the

-11-

> rights, privileges or duties of the lessee under a lease, followed diligently and in due course by the construction of a derrick and other necessary structures for the drilling of an oil and gas well, and by the actual operation of drilling in the ground.

Patrick H. Martin & Bruce M. Kramer, Williams & Meyers, Oil and Gas Law § 618.1 (2012). Based on the aforementioned cases and commentaries on the definition of "engaged in drilling or reworking operations," the Court does not find this term to be ambiguous.

Defendants contend that Hess commenced drilling operations within the five-year primary term, because acts taken in preparation for drilling constitute commencement. Defendants assert that the term "commencement" constitutes making a single act toward the desired result.  (Defs.' Mot. at 8, citing *Duffield v. Hall*, 19 Ohio C.C. 266, 268-69, 1899 Ohio Misc. LEXIS 335, *5-6 (Ohio Cir. Ct. 1899) ("Any act, the performance of which has a tendency to produce the desired result, is a commencement of operation.")).  Defendants also rely on *Kaszar v. Meridian Oil & Gas Enterprise, Inc.*, 27 Ohio App. 3d 6, 7, 499 N.E. 2d 3, 4-5 (Ohio Ct. App. 1985) (finding lessees commenced operations sufficient to extend the lease where they "surveyed the site, staked out the well, and filed the necessary documents with the Securities and Exchange Commission").  In both of the cases relied upon by Defendants, the leases allowed for "commencement of a well."  Specifically, in *Kaszar*, the lease agreement specifically stated, "If the Lessee shall begin operations for the commencement of a well during the term of this lease or any extension thereof, the Lessee shall then have the right to complete the drilling of such wells . . . ."  (*Id*. at 7).

The Leases in this case, however, do not use the term commencement, but rather required the lessee to be "engaged in drilling or reworking operations" by the end of the primary term.

(Leases ¶ 7).[7]  Defendants argue that they commenced drilling operations on or around October 27, 2010, by requesting and receiving permission from the Ohio Department of Natural Resources to commence preliminary site work, which included leveling the location and constructing the access road into said location.  Plaintiffs argue that drilling did not commence until the spud date in early April 2011.

The Court finds neither of the parties' arguments persuasive.  While requesting and receiving permits may have qualified as "commencement" in *Kaszar*, the specific terms of the Leases demand more.  "Drilling or reworking operations" contemplates a significant step toward drilling, if not drilling itself.  However, the Court also finds that Defendants could have been engaged in drilling operations long before a well bit was actually put in the ground, i.e. the spud date.[8]  For instance, there is no dispute that significant efforts were made to begin drilling, including leveling the location and preparation of the well pad and the access road.  Further, equipment was on the site and drilling was ready to begin.  Therefore, the Court finds that Defendant Hess' predecessor, Marquette, was engaged in drilling or reworking operations prior to the expiration of the primary term of the Leases on March 8, 2011.

The Court further finds that Plaintiffs' delay in asserting their rights bars their request that the Leases be terminated.  Plaintiffs were fully aware of the preparation and drilling operations that were underway on the pooled acreage.  The well was not drilled on any of the Plaintiffs' acreage, but it was on adjacent property.  Plaintiff DeRosa acknowledged that he

---

[7] Defendants and their predecessors were sophisticated parties and had they intended the habendum clause to mean commencement, they could have drafted the lease appropriately.

[8] After being shown Exhibit 9 referencing a spud date of April 2, 2011, Ms. Phillips testified that she would prefer to see the actual completion report filed with ODNR.  That report reflects a spud date of December 3, 2010.  (Phillips Depo. at 30-31, referencing Ex. 9).

witnessed drilling operations on the property of his neighbor, Kirk Porterfield.  (DeRosa Depo. at 68).  Plaintiffs, however, assert that they have not waived any of their rights.  They assert that they have refused to cash the "shut-in" checks and sought legal counsel.  In January 2012, Plaintiffs spoke with Brent Riggle regarding expiration of the Leases.  They obtained the e-mail address of Hess.  (Ex. 14 to Phillips Depo.).  Plaintiffs' attorney Harry White then contacted Hess on their behalf.  Further, the Plaintiffs were contacted about signing documents to extend the Leases, but they refused.  (DeRosa Depo. at 33-36; Eaton Depo. at 10-12).

On October 24, 2012, Plaintiffs had their new attorney send a letter to Ms. Phillips stating that the Leases had expired and any action taken on the property would be deemed a trespass. Hess, however, continued with reworking operations of the Porterfield A Well in November 2012.  There is no evidence that Plaintiffs did anything more until filing this action in May 2013. Plaintiffs had sought out legal counsel and could have sought injunctive relief to stop any drilling immediately upon the termination of the lease.  They waited until January of 2012 to consult an attorney, and ultimately May of 2013 to bring this case.  Meanwhile, Defendants' predecessor, Marquette, invested large sums of money to drill a well on "expired" leases.  Then, Hess purchased Marquette and paid over $1,500,000 to acquire Marquette's interest in the leased acreage.  (*See* Ex. A of Ivy Phillips' Depo.).  Further, Hess incurred costs of approximately $300,000 to assess the capabilities of both the Porterfield A and B wells in December 2012. (Martinez Decl. at ¶ 6).  Accordingly, Plaintiffs' delay stands as a bar to their request that the Leases be terminated.

**B.** **Do the shut-in provisions of the Leases allow Defendants to continue to maintain the Leases?**

Defendants maintain that not only did they properly drill the well in accordance with the

-14-

terms of the Leases, but that they continue to hold the Leases pursuant to Section 3 of the Leases, which provides in pertinent part: "If a well capable of producing gas. . . is shut in and no gas therefrom is sold or used, such shut-in well shall. . . be considered a well on such land producing gas in paying quantities and shall continue this lease . . . ." (Leases ¶ 3).  Ohio courts have recognized the purpose of a shut-in provision: "A shut-in royalty clause modifies the habendum clause so that the lease may be preserved between the time of discovery of product and marketing the same.  It is a savings clause." *American Energy Services v. Lekan*, 75 Ohio App. 3d 205, 215, 598 N.E.2d 1315, 1321-22 (Ohio Ct. App. 1992).

Plaintiffs contend that Defendants should not be able to hold the Leases beyond their primary terms where the well's capacity to produce cannot be determined.  Plaintiffs assert that at the time the well was drilled, Marquette could not have immediately transported gas because the gas composition and volume was unknown.

There is again no ambiguity with respect to the terms of the Leases.  Further, evidence has been presented that there was flow testing on the Porterfield A well and it is capable of producing gas.  The well is therefore capable of production and properly shut-in.  Accordingly, Defendants continue to hold the Porterfield A well as shut-in.

**C.      Holding the well in perpetuity**

Defendants argue, and the Court agrees, that companies, like Hess, regularly rely on tacking of savings clauses in leases.  Yet, both parties agree that "Ohio law directs" the Court "to adhere to the construction of the lease that avoids perpetual duration." *Phillips Exploration, Inc. v. Reitz*, No. 2:11-cv-920, 2012 U.S. Dist. LEXIS 178644, at *16-17 (S.D. Ohio Dec. 18, 2012) (Frost, J.).  In this case, the Court is concerned that Hess has failed to secure a market for the

gas.  Both parties have an interest in this well being productive.  With the increase of oil and gas activity in the surrounding area, Defendants should be making some effort to tie this well into a pipeline.  Yet, Defendants have not offered any evidence of such plans.  In fact, Defendants maintain that "there are no suitable pipelines within the vicinity of the Well."  (Petersen Decl. at ¶ 5).  And, that the capital expenditure required to connect the well to the existing pipeline system is not reasonably prudent for two wells (Porterfield A and B) due to the lack of an existing suitable pipeline in the vicinity of the wells and the current low price of natural gas.  (*Id.* at ¶ 7).

    Under Ohio law, there is an implied covenant to reasonably develop the land and market the product.  In *Lekan*, the court held that "the subject oil and gas lease does not by its language negate the imposition of implied covenants," including the covenant to market the product.  The court further stated:

> The covenant to market the product places an obligation upon a lessee to use due diligence to market the gas and/or oil produced from a well. This covenant is not eliminated by a shut-in royalty clause. A shut-in royalty clause modifies the habendum clause so that the lease may be preserved between the time of discovery of product and marketing of the same. It is a savings clause, but it certainly does not negate the duty to use due diligence to sell the production. The court finds that after reviewing all of the facts in this case the defendant has failed to conduct all operations that affect the lessor's royalty interest with reasonable care and due diligence.

75 Ohio App. 3d at 215.

    In *Beer v. Griffith*, 61 Ohio St. 2d 119, 399 N.E.2d 1227, syllabus ¶ 4 (Ohio 1980), the court held that "[w]here legal remedies are inadequate, forfeiture or cancellation of an oil and gas lease, in whole or in part, is an appropriate remedy for a lessee's violation of an implied covenant."  The *Beer* court ordered a partial forfeiture of the undrilled and/or unexploited

acreage after the lessee failed to do any work on the leased premises for over one year, and at least one well was near completion. *Id.* at 122. The *Beer* court held that "forfeiture of lessee's interest is warranted in order to assure the development of the land and the protection of lessor's interests." *Id.* (citing *Coffinberry v. Sun Oil Co.*, 68 Ohio St. 488, 496-500, 67 N.E. 1069, 1071-72 (Ohio 1903)). In *Coffinberry*, the lessee drilled two wells, but then failed to further develop the property. The court held that the plaintiff had no adequate remedy at law and "cancellation of the lease as to the undrilled portion of the premises" was proper. *Id.* at syllabus.

The United States Supreme Court has applied these same principles. In *Sauder v. Mid-Continent Petroleum Corp.*, 292 U.S. 272, 281 (1934), the Court held that the lessee of an oil and gas lease who produced oil on a forty-acre tract, but abstained from drilling on an adjacent section of land, could not hold the undeveloped part of the land indefinitely without drilling or establish intention to drill in the future. Specifically, the Court held that, "[t]he production of oil on a small portion of the leased tract cannot justify the lessee's holding the balance indefinitely and depriving the lessor not only of the expected royalty from production pursuant to the lease, but of the privilege of making some other arrangement for availing himself of the mineral content of the land." *Id.* Finding no adequate remedy at law, the Court rules that the lessor was equitably entitled to have the lease canceled as to the adjacent section. *Id.*

Plaintiffs repeatedly suggest that Defendants' "real motive" in holding the lease is to drill the extremely valuable Utica Shale. However, Defendants, like the lessees in the aforementioned cases, have continued to hold Plaintiffs' property but have breached the covenant to reasonably develop the land and/or market the product. The Court recognizes that Plaintiffs possess the same motivation as Defendants, the Utica Shale. Plaintiffs desire to have

the Leases terminated so they can negotiate a new lease of their acreage for thousands of dollars per acre.  Nonetheless, the Court finds it is unfair for Defendants to continue to hold all of Plaintiffs' acreage when they have only made efforts to develop the pooled acreage.  Based on the aforementioned case law, the Court finds that the legal remedies available to Plaintiffs are inadequate.  A partial lease forfeiture or cancellation is an appropriate equitable remedy as to the undrilled or unexploited acreage.  Therefore, the Court orders that Defendants shall continue to hold Plaintiffs' pooled acreage pursuant to the original Leases dated March 8, 2006.  This consists of the land pooled for the Porterfield Unit A, approximately 23 acres subject to the DeRosa Lease, approximately 29 acres subject to the Eaton Lease, and approximately 253 acres subject to the Mel-Tina Lease.  The Court further orders that Plaintiffs' acreage that is not subject to the pooling agreement, shall no longer be held by Defendants pursuant to the Leases. As of the date of the filing of this Opinion and Order, Plaintiffs' land, consisting of approximately 27 acres owned by Michael DeRosa, 25 acres owned by the Eatons, and 259 acres owned by Mel-Tina, Ltd., is hereby released from the Leases with Defendants, and Plaintiffs are free to negotiate new leases for their property.

IV.     **CONCLUSION**

Based on the foregoing, the Court **GRANTS in part and DENIES in part** Defendants'

Motion for Summary Judgment and **GRANTS in part and DENIES in part** Plaintiffs' Motion

for Summary Judgment.

The Clerk shall remove Documents 21, 29, and 34 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases.

**IT IS SO ORDERED.**

*/s/ George C. Smith*

**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**